AMELIA KIRWAN, an Infant, by JOHN A. KIRWAN, Her Guardian ad Litem, Appellant, *v.* AMERICAN LITHOGRAPHIC COMPANY, Respondent.

Master and servant — Labor Law — duty of master, who employs young children to work near revolving shafting, to provide safeguards for their protection — questions of fact.

A plaintiff is entitled, by reason of a nonsuit, to the benefit of any fact that the jury could have found from the evidence and to all the inferences warranted thereby.

When a master hires young children to work near revolving shafting, it is his duty to guard it, and in so doing to take into consideration their age, inexperience and lack of care and discretion, and adopt devices that will prevent the liability of their coming into contact with dangerous machinery while engaged in the performance of the work assigned them.

Plaintiff, who was employed in a factory, acting under instructions given her for carrying on her work, was injured by going into a place of danger where the shafting was unguarded, without being warned of the existence of the shaft. *Held,* on examination of the evidence, that there was a question for the jury and it was error to dismiss the complaint.

*Kirwan* v. *American Lithographic Co.,* 132 App. Div. 925, reversed.

(Argued January 18, 1910; decided February 8, 1910.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered May 17, 1909, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Rutherford B. Meyer* for appellant.    Whether or not the shafting was properly guarded was a question of fact for the jury.   (*G. F. P. C. Co.* v. *T. Ins. Co.*, 162 N. Y. 399; *Dillon* v. *N. C. T. Co.*, 181 N. Y. 215.)   Whether or not the defendant was negligent in failing to warn the plaintiff about the presence of the shaft under the table was a question of fact for the jury.   (*Pelon* v. *O. W. S. Co.*, 194 N. Y. 64; *Connolly* v. *Hall*, 192 N. Y. 182; *Makin* v. *P. C. Co.*, 111 App. Div. 726; 188 N. Y. 559; *Palmijiano* v. *H. M. Co.*, 126 App. Div. 221; 194 N. Y. 524; *Weinert* v. *M. & S. W. Co.*, 127 App. Div. 826; *Matej* v. *I. R., etc., Co.*, 133 App. Div. 131; *Irish* v. *U. B. & P. Co.*, 103 App. Div. 45; 183 N. Y. 508; *Gray* v. *Siegel-Cooper Co.*, 187 N. Y. 376; *Eastland* v. *Clarke*, 165 N. Y. 420; *McCarthy* v. *P. R. R. Co.*, 189 N. Y. 179; *Eastwood* v. *R. M. Co.*, 86 Hun, 91.)

*Frank Verner Johnson* for respondent.    The Labor Law does not require shafting to be guarded to such an extent as to make it impossible for employees to come in contact therewith, but only in such a way as to furnish them with reasonable protection while performing their duties in the ordinary and usual manner.   (*Cobb* v. *Welcher*, 75 Hun, 283; *G. F. P. C. Co.* v. *T. Ins. Co.*, 162 N. Y. 399; *Dillon* v. *N. C. T. Co.*, 181 N. Y. 215; *Ekendahl* v. *Hayes*, 10 App. Div. 487; *Shaw* v. *U. B. & P. Co.*, 76 App. Div. 296; *Wynkoop* v. *L. V. M. Co.*, 196 N. Y. 324; *Kirwan* v. *A. L. Co.*, 124 App. Div. 180.)   The plaintiff was of a sufficiently mature age to understand and appreciate the danger of coming in contact with moving machinery as a matter of law, and as it could not be reasonably anticipated that she would undertake to crawl between the protecting boards alongside the table for any purpose whatever, there was no occasion for warning her against the dangers of so doing.   (*Hickey* v. *Taffe*, 105 N. Y. 26; *Buckley* v. *G. P. & R. Mfg. Co.*, 113 N. Y. 540; *White*

v. *W. L. Co.*, 131 N. Y. 631; *Stevens* v. *Gair*, 109 App. Div. 621; *Scialo* v. *Steffens*, 105 App. Div. 592.)

Edward T. Bartlett, J.   The plaintiff was fourteen years and three months old at the time she entered the service of the defendant company, a large bookbinding establishment in the city of New York.   This was her first employment, having been taken from St. Joseph's Orphan Asylum for the purpose.   She met with the accident, which is the foundation of this action, about ten days after entering upon the discharge of her duties.   For at least two-thirds of that time she had been engaged in light work that involved no danger from proximity to machinery.   About four days prior to the accident hereinafter referred to, the plaintiff was assigned to the duty of assisting two young women known as "stitchers," whose duty it was to run stitching machines, fastened to a table, underneath which extended a revolving shaft furnishing the necessary power.

This action was brought under the Labor Law, and the notice required by that statute was duly served on the defendant, the material portion of which reads, referring to the plaintiff: "Her injuries were caused by her hair being caught in an unguarded revolving shaft * * * at which said Amelia Kirwan (the plaintiff) was working at the time she received her injury, due to the fact that said shafting was not properly guarded in the manner required by law; also owing to the negligence of your company for failing to provide a safe and suitable place in which to do her work; also owing to the failure of the superintendent, or the person charged with or exercising the duties of superintendent, to warn her of the danger of said revolving shaft."

The plaintiff's place of work was in a room on the fifth floor of the factory building, in which were a large number of stitching machines run by power conveyed to many of them from overhead shafting, but in the case of the machines near which the plaintiff was assigned to duty and a few others in that immediate locality, the power was received from

a shaft about an inch and three-quarters in diameter immediately under the table upon which the stitching machines rested.    A belt hole was cut through the top of the table and the belting passed from the shaft through it to the gear wheel of the machine.    The superintendent in this room was a Miss Blondell, who employed the plaintiff originally ; additional supervision was exercised by a floor walker named Bell.    The two young women stitchers, to whom reference has been made, each operated a stitching machine, and it was the duty of plaintiff to hand them unstitched sheets of pamphlets and to take them away when stitched.    The plaintiff said, in speaking of these girls :' "They operated two machines and I knocked up for these two operators.    *    *    *    I was right close up to the machines.    As the stitcher put her work through the machine she threw it on to this table and then I started to count it and pile it up into piles containing twenty-five pamphlets each."

The description of these tables upon which the machines rested is material at this point.    It was proved that the table was about the ordinary height, twenty-six inches, and parallel with the table and fastened to the legs thereof was a board four inches wide which was placed against the lower side of the table, making the open space below twenty-two inches from the floor.    Further down on the legs of the table and two inches from the floor, a second board was fastened, running parallel with the first one, being about six inches wide. The width of the lower board added to the two inches of space between it and the floor was about eight inches.    This left a clear open space between the two boards of about fourteen inches, affording an opportunity to reach under the table.

It appears that in the course of this work from time to time some of the stitched pamphlets, in being handled rapidly, would fall upon the floor.    At the time of the accident one or more pamphlets slipped down through the belt hole to the floor under the table.    The plaintiff, in availing herself of the fourteen inches of clear space, reached in under the table to

pick up the pamphlets lying on the floor.    It was proved that
this shafting underneath the table was about four inches from
the top of the table and an inch and three-quarters in diame-
ter.    The plaintiff testified in this connection as follows:
" When the books fell from the table they fell down into the
belt hole on to the floor under the table.    When I was hurt I
was stooping down to pick up those books.    From where I
worked at this table I could not see that iron bar.    I never
saw that iron bar before I was hurt.    Miss Blondell never
told me that the bar was under the table.    Mr. Bell never told
me that the bar was under the table.    Nobody ever told me
before I was hurt that the bar was under the table."

The plaintiff further testified : " While I was working in
this factory, and before I was hurt, I knew of a rule of the
factory in reference to work that had fallen on the floor.    Q.
Kindly state what the rule was ?    A. The rule was to keep
all good work off the floor.    The work that I stooped down
to pick up off the floor was stitched work; it was clean work.
I received instructions about picking up work off the floor.
I received these instructions from Miss Blondell."    Mr. Bell,
the floorwalker, was examined and stated as follows : " Q.
During the time that the plaintiff worked there, was it cus-
tomary for girls to pick up work that had fallen on the floor ?
A.  Yes."

It thus appears that the plaintiff was injured by going into
a place of danger where the shafting was unguarded, she
being instructed generally to pick up work from the floor
without being warned of the existence of this shaft.

The defendant has sought to shield itself from this clear
violation of the Labor Law, in so leaving the shaft unguarded,
by arguing that the parallel boards on the side of the table
were an effort to guard this shaft.    There is no proof that
these boards were put on for any such purpose, and if so
intended, they were in no sense a guarding of the shafting.
They were obviously put on to strengthen a table of consider-
able length subjected to the vibration of machinery in motion.
The effect of the upper board was to hide the shafting — not

27

to guard it; the lower board obviously did not guard it. If the master hires young children, especially girls with long hair, to work near revolving shafting, it is his duty to guard it, and in so doing to take into consideration their age, inexperience and lack of care and discretion, and adopt a shield or device that will prevent the liability of their heads coming into contact with dangerous machinery while engaged in the performance of the work assigned them.

The defendant sought further to shield itself from liability by claiming that a diagram it put in evidence showed that the clear space to enter under the table was ten and a half inches only. These figures were not proved and the trial judge stated that the diagram was admitted simply for the purpose of showing the location of the tables and the measurements already given, which were the heighth and width of the table.

The injuries inflicted upon the plaintiff were of a most serious and permanent character. On being released from the shaft about which her hair had become entangled, she was taken immediately to Bellevue Hospital, where she spent many months under treatment. She was treated immediately upon her arrival at the hospital by one Dr. Mabey. He testified, in part, as follows: "She was brought to the hospital in an ambulance and to one of my wards; she was suffering from avulsion of the scalp; that is, a greater part of the scalp was torn off and she had considerable shock and hemorrhage." In brief the doctor stated that more than two-thirds of the scalp was torn off, and that his treatment consisted in replacing that portion of it which had been thus removed and ascertaining, after a proper lapse of time, how much of it would heal. This treatment was not satisfactory and recourse was had to what is known as "skin grafting." The skin used for this purpose was taken from both thighs of the plaintiff. The surgeon was asked how much of the original scalp was left and he replied about one-third.

The judgment entered upon the verdict in favor of the plaintiff for five thousand dollars at the first trial was reversed by a divided court, Presiding Justice PATTERSON and Justice

LAUGHLIN dissenting, and the reason for that reversal was clearly stated by Mr. Justice HOUGHTON in the prevailing opinion as follows: " So far as appears there was no reason why the defendant or any of its servants in charge of its various departments should apprehend that the plaintiff would get under the table for any purpose. There was, therefore, no occasion for warning her against the dangers of doing such an unexpected thing." (*Kirwan* v. *Am. Lith. Co.*, 124 App. Div. 180, 182.)

In this second trial the reason which the Appellate Division found to be lacking has been fully supplied. The plaintiff reached beneath this table for the pamphlets on the floor in obedience to a rule of the defendant and in compliance with a general order to pick up new work that had fallen on the floor.

The Appellate Division in affirming the dismissal of plaintiff's complaint wrote no opinion, and evidently overlooked the fact that the alleged defect of proof on the first trial had been supplied. It is very clear that as the proofs stood at the close of the second trial there was a question for the jury, and it was manifest error to dismiss the complaint in the face of this new record.

The plaintiff is also entitled, by reason of the nonsuit, to the benefit of any fact that the jury could have found from the evidence and to all the inferences warranted thereby. (*Thedford* v. *Herbert*, 195 N. Y. 63, 68, and cases cited.)

The judgments of the Trial Term and Appellate Division should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., HAIGHT, VANN and WILLARD BARTLETT, JJ., concur; GRAY, J., dissents; CHASE, J., not voting.

Judgments reversed, etc.